AO 106 (Rev. 06/09)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the
Eastern District of Missouri

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE INFOTAINMENT/TELEMATICS SYSTEMS OF A **2019 DODGE RAM BEARING ILLINOIS REGISTRATION NUMBER 2982333 AND VEHICLE IDENTIFICATION NUMBER 1C6SRFJT5KN506009.** ) ) ) ) ) ) ) | Case No. 4:22 MJ 3118 NCC<br>*Signed and Submitted to the Court for filing by reliable electronic means*<br><br>**FILED UNDER SEAL** |

## APPLICATION FOR A SEARCH WARRANT

I, __David A. Rudolph__, a federal law enforcement officer or an attorney for the government request a search warrant and state under penalty of perjury that I have reason to believe that on the following:

INFOTAINMENT/TELEMATICS SYSTEMS OF A **2019 DODGE RAM BEARING ILLINOIS REGISTRATION NUMBER 2982333 AND VEHICLE IDENTIFICATION NUMBER 1C6SRFJT5KN506009.**

located in the _____EAS TERN_____ District of ____MISSOU RI____, there is now concealed

### SEE ATTACHMENT A.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
✓ evidence of a crime;
✓ contraband, fruits of crime, or other items illegally possessed;
✓ property designed for use, intended for use, or used in committing a crime;
❑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 18, U.S.C., §§ 2, 1519 | Destruction of evidence to obstruct a federal investigation |

The application is based on these facts:

SEE ATTACHED AFFIDAVIT WHICH IS INCORPORATED HEREIN BY REFERENCE.
✓ Continued on the attached sheet.
❑ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

I state under the penalty of perjury that the foregoing is true and correct.

_David A. Rudolph, Task Force Officer, FBI_

**Sworn to, attested to, and affirmed before me via reliable electronic means pursuant to Federal Rules of Criminal Procedure 4.1 and 41.**

Date: ___May 2, 2022_____

City and State: __St. Louis, MO_____

*Judge's signature*

Noelle C. Collins, U.S. Magistrate Judge
*Printed name and title*

AUSA: Nathan Chapman

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE INFOTAINMENT/TELEMATICS SYSTEMS OF A **2019 DODGE RAM BEARING ILLINOIS REGISTRATION NUMBER 2982333 AND VEHICLE IDENTIFICATION NUMBER 1C6SRFJT5KN506009.** | ) ) ) ) ) ) ) ) ) | Case No. 4:22 MJ 3118 NCC *Signed and Submitted to the Court for filing by reliable electronic means* **FILED UNDER SEAL** |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, David A. Rudolph, being first duly sworn, hereby depose and state a follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a warrant under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the extraction and forensic examination of electronically stored information within the infotainment/telematics systems of a 2019 Silver Ram Truck, VIN 1C6SRFJT5KN506009, with Illinois Registration 2982333 in the name of Jerome G. Williams (hereinafter the "**Target Vehicle**"), currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.      I am a Task Force Officer with the Federal Bureau of Investigation, duly appointed according to law and acting as such. Concurrent with this assignment, I have been commissioned as a St. Louis Metropolitan Police Officer for the past 16 years. I am currently assigned to the Homicide Division of the St. Louis Metropolitan Police Department (SLMPD) and serve as part of the violent crime squad, which is a part of the Safe Streets Violent Crime Task Force, which is a multi-agency Federal, State, and Local task force, of the Saint Louis Division of the Federal

Bureau of Investigation (FBI).  Through my training and experience, I am familiar with the debriefing of cooperating witnesses and/or other sources of information and methods of searching locations where firearms, instruments of money laundering, and evidence of other crimes may be found. The facts in this affidavit come from my personal observations, my training and experience, and my conversations with other law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

3.      Based on the facts set forth in this affidavit, there is probable cause to believe that violations of destruction of evidence to obstruct a federal investigation, in violation of Title 18, United States Code, Sections 2 and 1519 (hereinafter "Subject Offenses") have been committed by Jerome WILLIAMS and others known and unknown to investigators.  There is also probable cause to believe that evidence of the Subject Offenses further described in Attachment B will be found in a search of the information described in Attachment A.

## ITEM TO BE SEARCHED

4.      This affidavit is in support of an application for a search warrant to search the contents of the following:

> a. electronically stored information within the infotainment/telematics systems of a 2019 Silver Ram Truck, VIN 1C6SRFJT5KN506009, with Illinois Registration 2982333 in the name of Jerome G. Williams (hereinafter the "**Target Vehicle**").

5.      On or about April 29, 2022, the **Target Vehicle** was taken to SLMPD Department Laboratory after WILLIAMS was arrested, as described herein. The **Target Vehicle** was subsequently held for investigation given its potential involvement in the homicide of T.A. and

2

Jerome WILLIAMS' subsequent destruction of evidence to obstruct a federal investigation.  The **Target Vehicle** is currently being held at 1222 Clark Avenue, within the Eastern District of Missouri.  Investigators believe that probable cause exists that the **Target Vehicle** contains evidence of violations of Title 18, United States Code, Sections 2 and 1519 in the Eastern District of Missouri (hereinafter referred to as "the subject offenses").

6.      The applied-for warrant would authorize the forensic examination of electronically stored information within the infotainment/telematics systems of the **Target Vehicle**, as described in Attachment B.

## PROBABLE CAUSE

7.      On or about April 22, 2022, at approximately 12:45 AM, SLMPD officers received a call for a shooting at 4300 North Bircher Boulevard, St. Louis, Missouri, which is located within Penrose Park, in the Eastern District of Missouri.  Victim T.A. was found lying on the ground in a prone position near the park bathrooms.  The victim evidenced multiple puncture wounds to the face, arm, and torso and he was pronounced dead at the scene.  Items to include two cellular telephones along with two (2) .45 caliber cartridge casings were located at the scene.  Both cellular telephones found in victim T.A.'s possession were forensically examined to further the investigation.

8.      On or about April 19, 2022, Victim T.A. sent a Facebook message to vanity name "Trenale Belton" including two photographs of spent cartridge casings with messages stating "But I'm still alive"; "He missed and we are going to be on his ass"; and "Cuzzo's came from STL and NC and SeaTown."  Investigators believe that T.A. was explaining to "Trenale Belton" that he [T.A.] had been shot at while he was in New Jersey.

3

9.      On or about April 21, 2022, at approximately 5:52 PM, victim T.A. sent a text message to telephone contact "Jeremy Smith" which indicated that he was scared and going to travel to St. Louis for safety reasons.

10.     According to victim T.A.'s family, he had no known ties to the St. Louis, Missouri area.

11.     Investigators determined the victim T.A. obtained an Apple iPhone on or about April 21, 2022.  At approximately 3:29 PM, victim T.A.'s Apple iPhone captured a screenshot of a boarding pass in victim T.A.'s name from Newark Liberty International Airport to St. Louis Lambert International Airport (STL), via United Airlines flight 4406.

12.     On April 21, 2022, at approximately 8:32 PM, victim T.A.'s flight landed at St. Louis Lambert International Airport.

13.     Using his newly acquired Apple iPhone, victim T.A. called cellular telephone (518) 937-5874 for a short duration at 8:38 PM and completed an additional, approximately 17-minute phone conversation from approximately 8:59 PM to 9:16 PM.

14.     Victim T.A's Google Maps timeline reported that he departed St. Louis Lambert International Airport at approximately 9:16 PM and arrived at Penrose Park, the location of his murder, at approximately 9:31 PM.

15.     ShotSpotter, a system that detects the location of gun shots, recorded four gunshots fired at 9:31 PM within an 82-foot radius at/near the location of where the victim was found.[1]

---

[1] The area of the murder was outside the ShotSpotter coverage area; however, ShotSpotter does sometimes detect probable gunfire outside the confines of the normal coverage area.

16.     On or about April 22, 2022, the Hon. Craig Higgins from the Circuit Court of the City of St. Louis, State of Missouri, issued a precision location warrant (PLW) for cellular telephone number (518) 937-5874, which the victim T.A. had communicated with upon his arrival in St. Louis.  Utilizing the location information, investigators were able to track the location of the device utilizing that phone number, ultimately recovering the discarded device near the intersection of Interstate 70 and Lucas and Hunt Road, within the Eastern District of Missouri.

17.     Inspection of the discarded Apple iPhone utilizing telephone number (518) 937-5874 yielded a live photograph of what investigators believe to be victim T.A. as he laid face down in a grassy area. Additionally, a short video capturing what investigators believe is an audible gunshot was located on the telephone.  The video and photograph indicated a captured date and time of April 21, 2022, at 9:31 PM, which is consistent with the timing of the ShotSpotter report.

18.     Further inspection revealed the discarded Apple iPhone utilizing phone number (518) 937-5874 appeared to have been activated on April 20, 2022, around 5:43 PM in the area of 3700 Union Boulevard, St. Louis, Missouri.

19.     Investigators determined that the business located at 3700 Union Boulevard was a Crown Food Mart/Phillips 66 Gas Station.  To further the investigation, members of the investigative team obtained video surveillance from the Crown Food Mart/Phillips 66 Gas Station to determine who had purchased and activated the Apple iPhone bearing phone number (518) 937-5874.  The video surveillance captured two individuals who together took possession of the phone.

20.     The video surveillance further showed that at approximately 6:25 PM on April 20, 2022, Suspect 1 (hereinafter "S-1"), a black male wearing a light-colored hooded sweatshirt and dark baseball hat, arrived at the gas station in a red Mazda CX5.

5

Case: 4:22-mj-03118-NCC   Doc. #: 1   Filed: 05/02/22   Page: 7 of 20 PageID #: 7


21. At approximately 6:30 PM, the video surveillance showed WILLIAMS, a black male wearing a dark jacket, glasses and dark baseball hat, arrived in a silver color, newer model, Ram pickup truck, the **Target Vehicle**.

22. The two suspects approached the cell phone kiosk within the gas station and retrieved a cellular telephone from the attendant. Based upon a review of the cameras, it appeared that the cellular telephone was already activated by the attendant upon the suspects' arrival, and the cellular telephone was awaiting pickup by WILLIAMS and S-1.

23. Both S-1 and WILLIAMS went outside of the store and briefly met inside the **Target Vehicle** before departing in their respective vehicles at approximately 6:40 PM.

24. Further investigation revealed that the **Target Vehicle** seen at the gas station was registered to WILLIAMS.[2]

25. Investigators learned that WILLIAMS was previously convicted of a kidnapping resulting in death in 1990, in violation of 18 USC 1201(a)(1) in the Eastern District of Missouri, matter number 4:94-CR-00056 and ultimately sentenced to 420 months of incarceration. WILLIAMS is currently subject to supervised release overseen by the United States Probation Office for the Eastern District of Missouri.

---

[2] Using historical location information relative to the discarded Apple iPhone utilizing phone number (518) 937-5874, investigators determined that the telephone traveled northbound on Jefferson Avenue from Chouteau Avenue to the area of 1500 Washington Avenue between approximately 7:10 PM and 7:17 PM on April 20, 2022. Comparing the historical information to Real Time Crime Center (RTCC) camera footage, investigators located the **Target Vehicle** traveling northbound on Jefferson Avenue from Chouteau Avenue at approximately 7:10:55 PM. The **Target Vehicle's** license plate (Illinois 2982333) was identified by a LPRS at this intersection. The **Target Vehicle** traveled north on Jefferson Avenue and turned east on Washington Avenue. The **Target Vehicle** is last observed traveling east on Washington Avenue, through the intersection of 18th Street, at approximately 7:15:45 PM.

26.     WILLIAMS' probation officer provided investigators a recent photograph of WILLIAMS, which appeared to investigators to be consistent with the person seen in the gas station.

27.     On April 21, 2022, video surveillance demonstrated that WILLIAMS' **Target Vehicle** and S-1's Mazda were within the same immediate area in the Carr Square Neighborhood in the City of St. Louis approximately 30 minutes after victim T.A.'s murder.

28.     At approximately 9:58 PM, the discarded Apple iPhone logged that the user of the phone took 55 steps and activated the camera application.

29.     Video surveillance captured that WILLIAMS' **Target Vehicle** departed the Carr Square neighborhood area at 10:01 PM and went to his residence at 1511 Washington Avenue, St. Louis, Missouri.[3]  S-1's Mazda departed the area at approximately 10:13 PM.

30.     At approximately 10:04 PM, video surveillance captured WILLIAMS' arrival in his **Target Vehicle** at 1511 Washington Avenue, St. Louis, Missouri, where WILLIAMS resides. WILLIAMS remained in or around his vehicle for several minutes before exiting the parking garage to enter the apartment building.

31.     At 10:11 PM, the discarded Apple iPhone logged 809 steps and the activation of the camera application.

32.     Location data for the discarded Apple iPhone was consistent with the phone being present at 1511 Washington Avenue, St. Louis, Missouri at the time of the aforementioned camera activation.

---

[3] Apartment 6A within 1511 Washington Avenue has utilities in WILLIAMS' name.  Furthermore, it is the address WILLIAMS has on file with his federal probation officer.

33.     Based upon my training and experience, the video surveillance and phone data demonstrate that S-1 met WILLIAMS, used the camera application to view the photograph of victim T.A.'s body, and handed the phone off to WILLIAMS who, in turn, took the phone to his apartment at 1511 Washington Avenue, Apartment 6A, St. Louis, Missouri.

34.     At approximately 10:49 PM, video surveillance captured WILLIAMS departing the parking garage of 1511 Washington Avenue, St. Louis, Missouri in the **Target Vehicle**.

35.     At approximately 10:55 PM, video surveillance captured the **Target Vehicle** stop on the 1800 block of St. Charles Street, St. Louis, Missouri.  The video surveillance appeared to capture WILLIAMS discarding an item into a utility shaft/storm drain. Thereafter, surveillance video captured the **Target Vehicle** travel down north on Grand Boulevard towards I-70.   As previously stated, investigators recovered the discarded Apple iPhone on the side of I-70.

36.     On April 28, 2022, the FBI conducted a search of the utility shaft/storm drain and retrieved pieces of a torn up social security card belonging to victim T.A.

37.     On or about April 29, 2022, WILLIAMS was charged via Suppressed Criminal Complaint in the Eastern District of Missouri with violations of Title 18, United States Code, Sections 2 and 1519 under cause number 4:22 MJ 8129 SRW.  WILLIAMS was arrested that same morning and the **Target Vehicle** was searched and seized pursuant to a previously obtained warrant under cause number 4:22 MJ 8128 SRW.

38.     As described in detail below, electronic data, information, and images stored on these systems may be successfully extracted from the **Target Vehicle** using proprietary hardware and software developed by a private company called Berla, Inc.

39.     There is probable cause to believe that the requested information regarding the **Target Vehicle** would lead to evidence of the subject offenses.  For example, when someone

operates the **Target Vehicle**, text messages and/or cellular phone data that was connected to the Bluetooth entertainment system will become available and will allow investigates to identify that unknown person. There is, therefore, probable cause to believe that the **Target Vehicle's** infotainment system may contain information regarding the location, travel and identity of individuals who may have occupied or operated the **Target Vehicle** at the time of T.A.'s murder.

40.     I know that the **Target Vehicle's** infotainment/telematics systems have been stored in a manner in which the contents are, to the extent material to this investigation, in substantially the same state as they were when the **Target Vehicle** first came into law enforcement's possession.

## TECHNICAL BACKGROUND REGARDING THE VEHICLE AND ITS INFOTAINMENT AND TELEMATICS SYSTEMS

41.     Based on my training and experience, as well as discussions with other experienced law enforcement officers and witnesses, and from my review of publicly available information, I have learned that:

    a.   Many modern motor vehicles are equipped with sensors, cameras, transmitters, and electronic control units (ECUs)[4] to monitor and manage vehicle operations, track vehicle movement, and exchange information with other vehicles and

---

[4]     "ECU" is a generic term applied to any embedded computer that controls one or more electrical systems within a vehicle. ECUs are typically installed in a vehicle by the original equipment manufacturer during the manufacturing process. There are many types of ECUs, and as vehicles have more features each year, the number of ECUs in each motor vehicle increases. Newer motor vehicles can integrate as many as 150 ECUs, ensuring, in theory, that each part of the motor vehicle is running properly. Some examples of common ECUs include the Engine Control Module, Transmission Control Module, Brake Control Module, and Suspension Control Module, as well as the Telematics Control Unit and Infotainment Control Unit.

infrastructure.[5] These systems also enable motor vehicles to interface with various types of mobile devices to facilitate the use of applications, including third-party navigation, wireless telephone, multimedia streaming, and the like. To perform these computing functions, modern motor vehicles collect, process, and store significant volumes of data.

b.   Two commonly installed ECUs within motor vehicles are infotainment and telematics systems—sometimes referred to as the Telematics Control Unit and the Infotainment Control Unit. These systems typically retain large amounts of user data within the vehicle.

c.   A vehicle's infotainment system combines hardware and software to provide entertainment features. Many infotainment systems allow drivers and passengers to connect their handheld electronic devices to the vehicle. When connected, the driver and/or passengers may gain access to, for example, Global Positioning System ("GPS") navigation, video players, music streaming, voice calling, texting, and traffic data. Additionally, many infotainment systems enable services, such as: hands-free phone calls and talk-to-text functionality with Bluetooth connectivity;

---

[5]   The infotainment and telematics systems in motor vehicles are not the same as "black box" recorders. Black box recorders are called event data recorders (EDRs) or crash data recorders. These black box recorders can record vehicle speed, engine speed, steering angle, throttle position, braking status, force of impact, seatbelt status, and airbag deployment. In 2006, the US National Highway Traffic Safety Administration (NHTSA) adopted regulations requiring EDRs to uniformly collect certain crash data to assist crash investigators with accident reconstruction efforts. In 2012, NHTSA proposed requiring manufacturers to install EDRs in all new cars and trucks, but in 2019, the NHTSA withdrew the proposal because automakers have voluntarily installed the devices in nearly all vehicles.

music and video streaming; and/or turn-by-turn navigation. Many of these features are accessible via the (usually interactive) console located on the front dashboard of the vehicle.

d.  A vehicle's telematics system typically collects and stores diagnostic data from various systems (other ECUs) within the vehicle, including historical navigation points, speed, and event data. "Historical event data" may include location, as well as information regarding when the car's trunk, doors, and windows opened and closed, when headlights turned on and off, and when gears changed or brakes were engaged.

e.  The main difference between the infotainment and telematics systems is that the infotainment system is about entertainment for the occupants of the vehicle, and the telematics system is for collecting and reporting (transmitting) information—such as vehicle use data, maintenance requirements, and automotive servicing—about the vehicle. Typical telematics data may include turn-by-turn navigation, remote access, emergency calling, and maintenance notifications. Examples of vehicle telematics systems include General Motors' OnStar, BMW's "Assist," and Mercedes' "mbrace." Some of these systems are integrated multimedia navigation and telematics systems in one (combined infotainment/telematics systems), like Toyota's "Entune" and Ford's "Sync."

f.  The data generated, collected, transmitted, and retained by motor vehicles can provide valuable information for law enforcement, such as mobile device identifiers, wireless telephone numbers, user account details, call logs, messages, GPS coordinates, and other historical navigation information. For example,

11

historical location data transmitted and retained by a telematics provider may contain critical evidence regarding the whereabouts of a target of an investigation and/or relevant to attribution of a particular vehicle user.

g. I am aware that the computers (ECUs) within many connect cars store data for prolonged periods of time. Furthermore, even after a previously-connected mobile device is removed from the physical vehicle, much of the logical data—and some deleted data—may remain within the digital storage of the system. Such stored data can be used to identify locations, victims, witnesses, associates, and co-conspirators and may include communications and images of criminal activity. In sum, a forensic examination of a connected car's infotainment/telematics systems may reveal the vehicle's GPS location information, movements, operations, and user data at critical moments before, during, and after the commission of a crime.

h. As previous stated, the **Target Vehicle** is 2019 Silver Ram Truck, VIN 1C6SRFJT5KN506009, with Illinois Registration 2982333 in the name of Jerome G. Williams and is currently being secured at the SLMPD Department Laboratory, 1222 Clark Avenue, Saint Louis, Missouri 63103. I know the vehicle is supported by Berla's software because I have conducted a database inquiry through Berla's public website. The Berla website provided information the **Target Vehicle** is equipped with Infotainment/Telematics System.

i. To complete a forensic extraction from the **Target Vehicle**, it may also be necessary, temporarily, to remove trim and other components of the **Target Vehicle** to access the information subject to search. It may also be necessary to repair the device, replace the screen, reconnect wires, and replace batteries. It may be

necessary to employ advanced forensic processes to bypass locked display screens and other data access restrictions. Advanced processes may include potentially destructive forensic techniques used to remove memory chips from computers and other electronic storage containers that may be found within the **Target Vehicle**. In the event that potentially destructive processes are required to perform this extraction, parts of the **Target Vehicle** may be destroyed and rendered useless.

j. Furthermore, it may be necessary to return to the **Target Vehicle** and reconnect the infotainment and telematics systems to the **Target Vehicle**'s power source to perform the extraction using forensic software. This is because there are various computer networks working simultaneously when a vehicle is powered on, and in some vehicles, the infotainment and telematics systems require the other networks to work in tandem to complete the data extraction.

## **TECHNICAL TERMS**

42.   Based on my training and experience, I use the following technical terms to convey the following meanings:

a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone

13

numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Electronic Control Unit: An electronic control unit (ECU) is a generic term applied to any embedded computer that controls one or more electrical systems within a vehicle. ECUs are typically installed in a vehicle by the original equipment manufacturer (OEM) during the manufacturing process. There are many types of ECUs, and as vehicles have more features each year, the number of ECUs in each connected car increases. Newer connected cars can integrate as many as 150 ECUs, ensuring, in theory, that each part of the vehicle is running properly. Some examples of common ECUs include the Engine Control Module (ECM), Transmission Control Module (TCM), Brake Control Module (BCM), and Suspension Control Module (SCM), as well as the Telematics Control Unit (TCU) and Infotainment Control Unit (ICU).

c. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also

14

include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

d.  GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  Tablet: A tablet is a mobile computer, typically larger than a phone, yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "Wi-Fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

15

f.   Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

43.   Based on my training, experience, and research, including consulting the **Target Vehicle** manufacturer's website/manual if applicable, I know that the **Target Vehicle** has capabilities that allow it to connect to and download data from electronic devices such as smartphones, which have the capability of acting as a wireless telephone, portable media player, digital camera, GPS navigation device, etc. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, and therefore, was likely within the **Target Vehicle**.

<u>**CONCLUSION**</u>

44.   I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the **Target Vehicle's** infotainment/telematics systems as described in Attachment A to seek the items described in Attachment B.

I state under penalty of perjury that the foregoing is true and correct.

DAVID A. RUDOLPH
Task Force Officer
Federal Bureau of Investigation (FBI)

Sworn to, attested to, and affirmed before me via reliable electronic means pursuant to Federal Rules of Criminal Procedure 4.1 and 41 this _2nd_ day of May, 2022.

NOELLE C. COLLINS
United States Magistrate Judge
Eastern District of Missouri

16

## ATTACHMENT A

The property to be searched is the infotainment/telematics systems within a 2019 Silver Ram Truck, VIN 1C6SRFJT5KN506009, with Illinois Registration 2982333 in the name of Jerome G. Williams.  The **Target Vehicle** is currently located at SLMPD Department Laboratory, 1222 Clark Avenue, Saint Louis, Missouri 63103.

This warrant authorizes the forensic examination of the **Target Vehicle's** infotainment/telematics systems for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1.      All electronically stored information, on the Vehicle's infotainment and telematics systems described in Attachment A, that involves Jerome WILLIAMS and other known and unknown and relates to violations of Title 18, United States Code, Sections 2 and 1519 on the 2019 Silver Ram Truck, VIN 1C6SRFJT5KN506009, with Illinois Registration 2982333 in the name of Jerome G. Williams (hereinafter "**Target Vehicle's**") electronic systems on-board the vehicle that collect, maintain, and/or store data including, but not limited to, the vehicle's infotainment and/or telematic devices to include including:

    a.   Stored electronic data, information, images, and related digital storage, and/or vehicle diagnostic data from electronic systems within the **Target Vehicle**, including, but not limited to:

        i.   unique device identifiers;

        ii.   media files;

        iii.   call logs;

        iv.   contacts;

        v.   SMS;

        vi.   Bluetooth connections;

        vii.   USB connections;

        viii.   voice commands;

        ix.   voice recordings;

        x.   voice calling;

        xi.   web browser history;

        xii.   Wi-Fi connections;

xiii.    speech recognition;

xiv.    time updates;

xv.    track logs;

xvi.    traction events;

xvii.    traffic updates;

xviii.    stop/start log;

xix.    GPS warnings;

xx.    hard acceleration;

xxi.    hard braking;

xxii.    light status;

xxiii.    odometer reading;

xxiv.    gear shifts;

xxv.    historical navigation data;

xxvi.    historical speed data;

xxvii.    historical event data; and

xxviii.    data streaming services and related content.